## UNITED PAPERWORKERS INTERNATIONAL UNION, AFL–CIO, ET AL. *v.* MISCO, INC.

No. 86–651. Argued October 13, 1987—Decided December 1, 1987

WHITE, J., delivered the opinion for a unanimous Court. BLACKMUN, J., filed a concurring opinion, in which BRENNAN, J., joined, *post*, p. 46.

*David Silberman* argued the cause for petitioners. With him on the briefs were *Lynn Agee, Michael Gottesman,* and *Laurence Gold.*

*A. Richard Gear* argued the cause and filed a brief for respondent.*

JUSTICE WHITE delivered the opinion of the Court.

The issue for decision involves several aspects of when a federal court may refuse to enforce an arbitration award rendered under a collective-bargaining agreement.

## I

Misco, Inc. (Misco, or the Company), operates a paper converting plant in Monroe, Louisiana. The Company is a party to a collective-bargaining agreement with the United Paperworkers International Union, AFL–CIO, and its union local (the Union); the agreement covers the production and main-

---

*\*David E. Feller* and *William P. Murphy* filed a brief for the National Academy of Arbitrators as *amicus curiae* urging reversal.

*Philip A. Lacovara* and *William R. Stein* filed a brief for Northwest Airlines, Inc., et al. as *amici curiae* urging affirmance.

tenance employees at the plant. Under the agreement, the Company or the Union may submit to arbitration any grievance that arises from the interpretation or application of its terms, and the arbitrator's decision is final and binding upon the parties. The arbitrator's authority is limited to interpretation and application of the terms contained in the agreement itself. The agreement reserves to management the right to establish, amend, and enforce "rules and regulations regulating the discipline or discharge of employees" and the procedures for imposing discipline. Such rules were to be posted and were to be in effect "until ruled on by grievance and arbitration procedures as to fairness and necessity."[1] For about a decade, the Company's rules had listed as causes for discharge the bringing of intoxicants, narcotics, or controlled substances on to plant property or consuming any of them there, as well as reporting for work under the influence of such substances.[2] At the time of the events involved in this case, the Company was very concerned about the use of drugs at the plant, especially among employees on the night shift.

Isiah Cooper, who worked on the night shift for Misco, was one of the employees covered by the collective-bargaining agreement. He operated a slitter-rewinder machine, which uses sharp blades to cut rolling coils of paper. The arbitrator found that this machine is hazardous and had caused numerous injuries in recent years. Cooper had been reprimanded twice in a few months for deficient performance.

---

[1] App. 20–21. The language quoted is from Article XI of the agreement, which concerns maintenance of discipline. Article VI of the agreement sets out the arbitration procedure. *Id.*, at 18–20. The reserved rights of management are specified in Article IV of the agreement. *Id.*, at 13–15.

[2] Rule II.1 lists the following as causes for discharge: "Bringing intoxicants, narcotics, or controlled substances into, or consuming intoxicants, narcotics or controlled substances in the plant, or on plant premises. Reporting for duty under the influence of intoxicants, narcotics, or controlled substances." App. to Pet. for Cert. 31a.

On January 21, 1983, one day after the second reprimand, the police searched Cooper's house pursuant to a warrant, and a substantial amount of marijuana was found. Contemporaneously, a police officer was detailed to keep Cooper's car under observation at the Company's parking lot. At about 6:30 p.m., Cooper was seen walking in the parking lot during work hours with two other men. The three men entered Cooper's car momentarily, then walked to another car, a white Cutlass, and entered it. After the other two men later returned to the plant, Cooper was apprehended by police in the backseat of this car with marijuana smoke in the air and a lighted marijuana cigarette in the frontseat ashtray. The police also searched Cooper's car and found a plastic scales case and marijuana gleanings. Cooper was arrested and charged with marijuana possession.[3]

On January 24, Cooper told the Company that he had been arrested for possession of marijuana at his home; the Company did not learn of the marijuana cigarette in the white Cutlass until January 27. It then investigated and on February 7 discharged Cooper, asserting that in the circumstances, his presence in the Cutlass violated the rule against having drugs on the plant premises.[4] Cooper filed a grievance protesting his discharge the same day, and the matter proceeded to arbitration. The Company was not aware until September 21, five days before the arbitration hearing was scheduled, that marijuana had been found in Cooper's car. That fact did not become known to the Union until the hearing began. At the hearing it was stipulated that the issue was whether the Company had "just cause to discharge

---

[3] Cooper later pleaded guilty to that charge, which was not related to his being in a car with a lighted marijuana cigarette in it. The authorities chose not to prosecute for the latter incident.

[4] The Company asserted that being in a car with a lit marijuana cigarette was a direct violation of the company rule against having an illegal substance on company property. App. 23.

the Grievant under Rule II.1" and, "[i]f not, what if any should be the remedy." App. to Pet. for Cert. 26a.

The arbitrator upheld the grievance and ordered the Company to reinstate Cooper with backpay and full seniority. The arbitrator based his finding that there was not just cause for the discharge on his consideration of seven criteria.[5] In particular, the arbitrator found that the Company failed to prove that the employee had possessed or used marijuana on company property: finding Cooper in the backseat of a car and a burning cigarette in the frontseat ashtray was insufficient proof that Cooper was using or possessed marijuana on company property. *Id.*, at 49a–50a. The arbitrator refused to accept into evidence the fact that marijuana had been found in Cooper's car on company premises because the Company did not know of this fact when Cooper was discharged and therefore did not rely on it as a basis for the discharge.[6]

The Company filed suit in District Court, seeking to vacate the arbitration award on several grounds, one of which was that ordering reinstatement of Cooper, who had allegedly possessed marijuana on the plant premises, was contrary to public policy. The District Court agreed that the award must be set aside as contrary to public policy because it ran

---

[5] These considerations were the reasonableness of the employer's position, the notice given to the employee, the timing of the investigation undertaken, the fairness of the investigation, the evidence against the employee, the possibility of discrimination, and the relation of the degree of discipline to the nature of the offense and the employee's past record.

[6] The arbitrator stated: "One of the rules in arbitration is that the Company must have its proof in hand before it takes disciplinary action against an employee. The Company does not take the disciplinary action and then spend eight months digging up supporting evidence to justify its actions. In addition, the use of the gleanings evidence prevented the Grievant from knowing the full extent of the charge against him. Who knows what action the Grievant or the Union would have taken if the gleanings evidence had been made known from the outset of the Company's investigation." App. to Pet. for Cert. 47a.

counter to general safety concerns that arise from the operation of dangerous machinery while under the influence of drugs, as well as to state criminal laws against drug possession. The Court of Appeals affirmed, with one judge dissenting. The court ruled that reinstatement would violate the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d 739, 743 (CA5 1985). The arbitrator had found that Cooper was apprehended on company premises in an atmosphere of marijuana smoke in another's car and that marijuana was found in his own car on the company lot. These facts established that Cooper had violated the Company's rules and gave the Company just cause to discharge him. The arbitrator did not reach this conclusion because of a "narrow focus on Cooper's procedural rights" that led him to ignore what he "knew was in fact true: that Cooper *did* bring marijuana onto his employer's premises." *Ibid.* Even if the arbitrator had not known of this fact at the time he entered his award, "it is doubtful that the award should be enforced today in light of what is now known." *Ibid.*

Because the Courts of Appeals are divided on the question of when courts may set aside arbitration awards as contravening public policy,[7] we granted the Union's petition for a writ of certiorari, 479 U. S. 1029 (1987), and now reverse the judgment of the Court of Appeals.

---

[7] The decision below accords with the broader view of the courts' power taken by the First and Seventh Circuits. See, *e. g., United States Postal Service* v. *American Postal Workers Union, AFL–CIO,* 736 F. 2d 822 (CA1 1984); *E. I. DuPont de Nemours and Co.* v. *Grasselli Employees Independent Assn. of East Chicago, Inc.,* 790 F. 2d 611 (CA7), cert. denied, 479 U. S. 853 (1986). A narrower view has been taken by the Ninth and District of Columbia Circuits. See, *e. g., Bevles Co.* v. *Teamsters Local 986,* 791 F. 2d 1391 (CA9 1986); *Northwest Airlines, Inc.* v. *Air Line Pilots Assn. International,* 257 U. S. App. D. C. 181, 808 F. 2d 76 (1987); *American Postal Workers Union* v. *United States Postal Service,* 252 U. S. App. D. C. 169, 789 F. 2d 1 (1986).

## II

The Union asserts that an arbitral award may not be set aside on public policy grounds unless the award orders conduct that violates the positive law, which is not the case here. But in the alternative, it submits that even if it is wrong in this regard, the Court of Appeals otherwise exceeded the limited authority that it had to review an arbitrator's award entered pursuant to a collective-bargaining agreement. Respondent, on the other hand, defends the public policy decision of the Court of Appeals but alternatively argues that the judgment below should be affirmed because of erroneous findings by the arbitrator. We deal first with the opposing alternative arguments.

### A

Collective-bargaining agreements commonly provide grievance procedures to settle disputes between union and employer with respect to the interpretation and application of the agreement and require binding arbitration for unsettled grievances. In such cases, and this is such a case, the Court made clear almost 30 years ago that the courts play only a limited role when asked to review the decision of an arbitrator. The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Steelworkers* v. *Enterprise Wheel & Car Corp.*, 363 U. S. 593, 596 (1960). As long as the arbitrator's award "draws its essence from the collective bargaining agreement," and is not merely "his own brand of industrial justice," the award is legitimate. *Id.*, at 597.

> "The function of the court is very limited when the parties have agreed to submit all questions of contract inter-

pretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

"The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." *Steelworkers* v. *American Mfg. Co.*, 363 U. S. 564, 567–568 (1960) (emphasis added; footnote omitted).

See also *AT&T Technologies, Inc.* v. *Communications Workers*, 475 U. S. 643, 649–650 (1986).

The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations. These statutes reflect a decided preference for private settlement of labor disputes without the intervention of government: The Labor Management Relations Act of 1947, 61 Stat. 154, 29 U. S. C. § 173(d), provides that "[f]inal adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." See also *AT&T Technologies, supra,* at 650. The courts have jurisdiction to enforce collective-bargaining contracts; but where the contract provides grievance and arbitration procedures, those procedures must first be exhausted and courts must order resort to the private settlement mechanisms without dealing with the merits of the dispute. Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the mean-

ing of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract. *Enterprise Wheel, supra,* at 599. So, too, where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect. If the courts were free to intervene on these grounds, the speedy resolution of grievances by private mechanisms would be greatly undermined. Furthermore, it must be remembered that grievance and arbitration procedures are part and parcel of the ongoing process of collective bargaining. It is through these processes that the supplementary rules of the plant are established. As the Court has said, the arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision. Of course, decisions procured by the parties through fraud or through the arbitrator's dishonesty need not be enforced. But there is nothing of that sort involved in this case.

## B

The Company's position, simply put, is that the arbitrator committed grievous error in finding that the evidence was insufficient to prove that Cooper had possessed or used marijuana on company property. But the Court of Appeals, although it took a distinctly jaundiced view of the arbitrator's decision in this regard, was not free to refuse enforcement because it considered Cooper's presence in the white Cutlass, in the circumstances, to be ample proof that Rule II.1 was violated. No dishonesty is alleged; only improvident, even silly, factfinding is claimed. This is hardly a sufficient basis for disregarding what the agent appointed by the parties determined to be the historical facts.

Nor was it open to the Court of Appeals to refuse to enforce the award because the arbitrator, in deciding whether there was just cause to discharge, refused to consider evidence unknown to the Company at the time Cooper was fired. The parties bargained for arbitration to settle disputes and were free to set the procedural rules for arbitrators to follow if they chose. Article VI of the agreement, entitled "Arbitration Procedure," did set some ground rules for the arbitration process. It forbade the arbitrator to consider hearsay evidence, for example, but evidentiary matters were otherwise left to the arbitrator. App. 19. Here the arbitrator ruled that in determining whether Cooper had violated Rule II.1, he should not consider evidence not relied on by the employer in ordering the discharge, particularly in a case like this where there was no notice to the employee or the Union prior to the hearing that the Company would attempt to rely on after-discovered evidence. This, in effect, was a construction of what the contract required when deciding discharge cases: an arbitrator was to look only at the evidence before the employer at the time of discharge. As the arbitrator noted, this approach was consistent with the prac-

tice followed by other arbitrators.[8] And it was consistent with our observation in *John Wiley & Sons, Inc.* v. *Livingston,* 376 U.S 543, 557 (1964), that when the subject matter of a dispute is arbitrable, "procedural" questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator.

Under the Arbitration Act, the federal courts are empowered to set aside arbitration awards on such grounds only when "the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." 9 U. S. C. § 10(c). See *Commonwealth Coatings Corp.* v. *Continental Casualty Co.,* 393 U. S. 145 (1968).[9] If we apply that same standard here and assume that the arbitrator erred in refusing to consider the disputed evidence, his error was not in bad faith or so gross as to amount to affirmative misconduct.[10] Finally, it is worth noting that put-

---

[8] Labor arbitrators have stated that the correctness of a discharge "must stand or fall upon the reason given at the time of discharge," see, *e. g., West Va. Pulp & Paper Co.,* 10 Lab. Arb. 117, 118 (1947), and arbitrators often, but not always, confine their considerations to the facts known to the employer at the time of the discharge. O. Fairweather, Practice and Procedure in Labor Arbitration 303–306 (2d ed. 1983); F. Elkouri & E. Elkouri, How Arbitration Works 634–635 (3d ed. 1973).

[9] The Arbitration Act does not apply to "contracts of employment of . . . workers engaged in foreign or interstate commerce," 9 U. S. C. § 1, but the federal courts have often looked to the Act for guidance in labor arbitration cases, especially in the wake of the holding that § 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185, empowers the federal courts to fashion rules of federal common law to govern "[s]uits for violation of contracts between an employer and a labor organization" under the federal labor laws. *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448 (1957) (construing 29 U. S. C. § 185). See, *e. g., Ludwig Honold Mfg. Co.* v. *Fletcher,* 405 F. 2d 1123 (CA3 1969); *Pietro Scalzitti Co.* v. *International Union of Operating Engineers, Local No. 150,* 351 F. 2d 576 (CA7 1965).

[10] Even in the very rare instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct, as a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result, since this step would improp-

ting aside the evidence about the marijuana found in Cooper's car during this arbitration did not forever foreclose the Company from using that evidence as the basis for a discharge.

Even if it were open to the Court of Appeals to have found a violation of Rule II.1 because of the marijuana found in Cooper's car, the question remains whether the court could properly set aside the award because in its view discharge was the correct remedy. Normally, an arbitrator is authorized to disagree with the sanction imposed for employee misconduct. In *Enterprise Wheel,* for example, the arbitrator reduced the discipline from discharge to a 10-day suspension. The Court of Appeals refused to enforce the award, but we reversed, explaining that though the arbitrator's decision must draw its essence from the agreement, he "is to bring his informed judgment to bear in order to reach a fair solution of a problem. *This is especially true when it comes to formulating remedies.*" 363 U. S., at 597 (emphasis added). The parties, of course, may limit the discretion of the arbitrator in this respect; and it may be, as the Company argues, that under the contract involved here, it was within the unreviewable discretion of management to discharge an employee once a violation of Rule II.1 was found. But the parties stipulated that the issue before the arbitrator was whether there was "just" cause for the discharge, and the arbitrator, in the course of his opinion, cryptically observed that Rule II.1

erly substitute a judicial determination for the arbitrator's decision that the parties bargained for in the collective-bargaining agreement. Instead, the court should simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement. The court also has the authority to remand for further proceedings when this step seems appropriate. See, *e. g., Amalgamated Food & Allied Workers Union, Local 56* v. *Great A&P Tea Co.,* 415 F. 2d 185 (CA3 1969) (vacating and remanding to the arbitrators for decision after finding that the arbitrators declined to arbitrate the issues submitted). See also 9 U. S. C. § 10(e) ("Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators").

merely listed causes for discharge and did not expressly provide for immediate discharge. Before disposing of the case on the ground that Rule II.1 had been violated and discharge was therefore proper, the proper course would have been remand to the arbitrator for a definitive construction of the contract in this respect.

## C

The Court of Appeals did not purport to take this course in any event. Rather, it held that the evidence of marijuana in Cooper's car required that the award be set aside because to reinstate a person who had brought drugs onto the property was contrary to the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d, at 743. We cannot affirm that judgment.

A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy. *W. R. Grace & Co.* v. *Rubber Workers*, 461 U. S. 757, 766 (1983); *Hurd* v. *Hodge*, 334 U. S. 24, 34–35 (1948). That doctrine derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act, and is further justified by the observation that the public's interests in confining the scope of private agreements to which it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements. *E. g.*, *McMullen* v. *Hoffman*, 174 U. S. 639, 654–655 (1899); *Twin City Pipe Line Co.* v. *Harding Glass Co.*, 283 U. S. 353, 356–358 (1931). In the common law of contracts, this doctrine has served as the foundation for occasional exercises of judicial power to abrogate private agreements.

In *W. R. Grace*, we recognized that "a court may not enforce a collective-bargaining agreement that is contrary to public policy," and stated that "the question of public policy is ultimately one for resolution by the courts." 461 U. S., at 766. We cautioned, however, that a court's refusal to enforce an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Ibid.* (quoting *Muschany* v. *United States*, 324 U. S. 49, 66 (1945)). In *W. R. Grace*, we identified two important public policies that were potentially jeopardized by the arbitrator's interpretation of the contract: obedience to judicial orders and voluntary compliance with Title VII of the Civil Rights Act of 1964. We went on to hold that enforcement of the arbitration award in that case did not compromise either of the two public policies allegedly threatened by the award. Two points follow from our decision in *W. R. Grace*. First, a court may refuse to enforce a collective-bargaining agreement when the specific terms contained in that agreement violate public policy. Second, it is apparent that our decision in that case does not otherwise sanction a broad judicial power to set aside arbitration awards as against public policy. Although we discussed the effect of that award on two broad areas of public policy, our decision turned on our examination of whether the award created any explicit conflict with other "laws and legal precedents" rather than an assessment of "general considerations of supposed public interests." 461 U. S., at 766. At the very least, an alleged public policy must be properly framed under the approach set out in *W. R. Grace*, and the violation of such a policy must be clearly shown if an award is not to be enforced.

44

As we see it, the formulation of public policy set out by the Court of Appeals did not comply with the statement that such a policy must be "ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Ibid.* (quoting *Muschany* v. *United States, supra,* at 66). The Court of Appeals made no attempt to review existing laws and legal precedents in order to demonstrate that they establish a "well-defined and dominant" policy against the operation of dangerous machinery while under the influence of drugs. Although certainly such a judgment is firmly rooted in common sense, we explicitly held in *W. R. Grace* that a formulation of public policy based only on "general considerations of supposed public interests" is not the sort that permits a court to set aside an arbitration award that was entered in accordance with a valid collective-bargaining agreement.

Even if the Court of Appeals' formulation of public policy is to be accepted, no violation of that policy was clearly shown in this case. In pursuing its public policy inquiry, the Court of Appeals quite properly considered the established fact that traces of marijuana had been found in Cooper's car. Yet the assumed connection between the marijuana gleanings found in Cooper's car and Cooper's actual use of drugs in the workplace is tenuous at best and provides an insufficient basis for holding that his reinstatement would actually violate the public policy identified by the Court of Appeals "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d, at 743. A refusal to enforce an award must rest on more than speculation or assumption.

In any event, it was inappropriate for the Court of Appeals itself to draw the necessary inference. To conclude from the fact that marijuana had been found in Cooper's car that Cooper had ever been or would be under the influence of marijuana while he was on the job and operating dangerous machinery is an exercise in factfinding about Cooper's use of

drugs and his amenability to discipline, a task that exceeds the authority of a court asked to overturn an arbitration award. The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them who had more opportunity to observe Cooper and to be familiar with the plant and its problems. Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task. If additional facts were to be found, the arbitrator should find them in the course of any further effort the Company might have made to discharge Cooper for having had marijuana in his car on company premises. Had the arbitrator found that Cooper had possessed drugs on the property, yet imposed discipline short of discharge because he found as a factual matter that Cooper could be trusted not to use them on the job, the Court of Appeals could not upset the award because of its own view that public policy about plant safety was threatened.[11] In this connection it should also be noted that the award ordered Cooper to be reinstated in his old job or in an equivalent one for which he was qualified. It is by no means clear from the record that Cooper would pose a serious threat to the asserted public policy in every job for which he was qualified.[12]

The judgment of the Court of Appeals is reversed.

*So ordered.*

---

[11] The issue of safety in the workplace is a commonplace issue for arbitrators to consider in discharge cases, and it was a matter for the arbitrator in the first instance to decide whether Cooper's alleged use of drugs on the job would actually pose a danger. That is not a problem here, for the arbitrator recognized that being under the influence of marijuana while operating slitter-rewinder machinery was indeed dangerous, and no one disputed this point. ·

[12] We need not address the Union's position that a court may refuse to enforce an award on public policy grounds only when the award itself violates a statute, regulation, or other manifestation of positive law, or compels conduct by the employer that would violate such a law.

46

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN joins, concurring.

I join the Court's opinion, but write separately to underscore the narrow grounds on which its decision rests and to emphasize what it is *not* holding today. In particular, the Court does not reach the issue upon which certiorari was granted: whether a court may refuse to enforce an arbitration award rendered under a collective-bargaining agreement on public policy grounds only when the award itself violates positive law or requires unlawful conduct by the employer. The opinion takes no position on this issue. See *ante*, at 45, n. 12. Nor do I understand the Court to decide, more generally, in what way, if any, a court's authority to set aside an arbitration award on public policy grounds differs from its authority, outside the collective-bargaining context, to refuse to enforce a contract on public policy grounds. Those issues are left for another day.

I agree with the Court that the judgment of the Court of Appeals must be reversed, and I summarize what I understand to be the three alternative rationales for the Court's decision:

1. The Court of Appeals exceeded its authority in concluding that the company's discharge of Cooper was proper under the collective-bargaining agreement. The Court of Appeals erred in considering evidence that the arbitrator legitimately had excluded from the grievance process, in second-guessing the arbitrator's factual finding that Cooper had not violated Rule II.1, and in assessing the appropriate sanction under the agreement. See *Steelworkers* v. *American Mfg. Co.*, 363 U. S. 564, 567–568 (1960); *Steelworkers* v. *Enterprise Wheel & Car Corp.*, 363 U. S. 593, 596–597, 599 (1960). Absent its overreaching, the Court of Appeals lacked any basis for disagreeing with the arbitrator's conclusion that there was not "just cause" for discharging Cooper. See *ante*, at 39–42.

2. Even if the Court of Appeals properly considered evidence of marijuana found in Cooper's car and legitimately found a Rule II.1 violation, the public policy advanced by the Court of Appeals does not support its decision to set aside the award. The reinstatement of Cooper would not contravene the alleged public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d 739, 743 (CA5 1985). The fact that an employee's car contains marijuana gleanings does not indicate that the employee uses marijuana on the job or that he operates his machine while under the influence of drugs, let alone that he will report to work in an impaired state in the future. See *ante*, at 44. Moreover, nothing in the record suggests that the arbitrator's award, which gives the company the option of placing Cooper in a job equivalent to his old one, would require Cooper to operate hazardous machinery. See *ante*, at 44–45.

3. The public policy formulated by the Court of Appeals may not properly support a court's refusal to enforce an otherwise valid arbitration award. In *W. R. Grace & Co.* v. *Rubber Workers*, 461 U. S. 757 (1983), we stated that the public policy must be founded on "'laws and legal precedents.'" *Id.*, at 766, quoting *Muschany* v. *United States*, 324 U. S. 49, 66 (1945). The Court of Appeals identified no law or legal precedent that demonstrated an "explicit public policy," 461 U. S., at 766, against the operation of dangerous machinery by persons under the influence of drugs. Far from being "well defined and dominant," as *W. R. Grace* prescribed, the Court of Appeals' public policy was ascertained merely "from general considerations of supposed public interests." *Ibid.* See *ante*, at 43. I do not understand the Court, by criticizing the company's public policy formulation, to suggest that proper framing of an alleged public policy under the approach set out in *W. R. Grace* would be sufficient to justify a court's refusal to enforce an arbitration award on public policy grounds. Rather, I understand the

Court to hold that such compliance is merely a necessary step if an award is not to be enforced. See *ante*, at 44.

It is on this understanding that I join the opinion of the Court.